# EXHIBIT B

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------------------------X
     JONATHAN HARRIS,
 3
                                  PLAINTIFF,
 4
                   -against-      Case No. 15-CV-8456
 5
     CITY OF NEW YORK; and JOHN and JANE DOE 1 through 10,
 6   individually and in their official capacities
     (the names John and Jane Doe being fictitious,
 7   as the true names are presently unknown),
 8                                DEFENDANTS.
     ------------------------------------------------X
 9
10
11                    DATE:  May 18, 2016
12                    TIME:  10:45 A.M.
13
14                    DEPOSITION of the Plaintiff,
15   JONATHAN HARRIS, taken by the Defendant, pursuant
16   to a Court Order and to the Federal Rules of Civil
17   Procedure, held at the offices of The Metropolitan
18   Correctional Facility, 150 Park Row, New York,
19   New York 10007, before Robert Gonzalez, a Notary
20   Public of the State of New York.
21
22
23
24
25
```

```
 1   A P P E A R A N C E S:

 2

 3        HARVIS & FETT, LLP
               Attorneys for Plaintiff
 4             305 Broadway
               14th Floor
 5             New York, New York 10007
               BY:  GABRIEL P. HARVIS, ESQ.
 6

 7

          ZACHARY W. CARTER, ESQ.
 8        CORPORATION COUNSEL
          NEW YORK CITY LAW DEPARTMENT
 9             Attorney for Defendant
               CITY OF NEW YORK
10             100 Church Street
               New York, New York 10007
11             BY:  PAUL JOHNSON, ESQ.
               File No. 2015-047964
12             Control No. 161643

13

14                  *         *         *

15

16

17

18

19

20

21

22

23

24

25
```

J. HARRIS

1  J O N A T H A N    H A R R I S , called as a witness,

2  having been first duly sworn by a Notary Public of the

3  State of New York, was examined and testified as follows:

4  EXAMINATION BY

5  MR. JOHNSON:

6      Q.    State your name for the record.

7      A.    Jonathan Harris.

8      Q.    State your address for the record, home address.

9      A.    331 East 146 Street, 3rd and College.

10      Q.    Where is that?

11      A.    Bronx, New York.

12      Q.    Good morning, Mr. Harris.

13      I am Paul Johnson.  I am an attorney with the

14  office of Corporation Counsel for the City of New York.  I

15  represent the Defendants in this matter with this lawsuit

16  you filed.

17      I would like to go over a few basic rules of the

18  deposition.  I will ask you questions today about

19  information you may have regarding your claims.  Do you

20  understand that even though we are not in the courtroom now

21  the oath you took is the same oath you would take on the

22  witness stand should the case go to trail?

23      A.    Yes.

24      Q.    I will be asking you questions and the Court

25  Reporter will be recording those questions and your

1     A.    Newark.

2     Q.    Why don't you live with your mother?

3           MR. HARVIS:  Objection.

4           MR. JOHNSON:  You can still answer.

5     A.    I don't know.  I didn't want to go over there.  I

6     am not a Jersey person.  I am a New York City person.

7     Q.    How long has she lived in Newark?

8     A.    I believe two years.

9     Q.    Why did she move to Newark?

10    A.    For more space.

11    Q.    Do you have a middle name?

12    A.    Yes.

13    Q.    What's your middle name?

14    A.    Devontae.

15    Q.    Have you ever used a different name legally?

16    A.    No.

17    Q.    Have you ever been known by any other name other

18    than Jonathan Harris?

19    A.    Yes.

20    Q.    What name is that?

21    A.    Eggy.

22    Q.    How long have you used that nickname?

23          MR. HARVIS:  Objection.  You can answer.

24    A.    A couple of years.  I don't really have a number.

25    Q.    More than three years?

1    A.    I wouldn't say.

2    Q.    And how did you get that name?

3    A.    Because of my childhood.

4    Q.    What about your childhood?

5    A.    I used to get a very light Caesar, shaving my

6    head.

7    Q.    So it looked like an egg?

8    A.    Yes.

9    Q.    And who called you Eggy?

10   A.    An older person, older guy.

11   Q.    What older guy?

12   A.    I don't remember his name.  Years ago.

13   Q.    And who else called you by that name?

14   A.    Some friends.

15   Q.    Was that nickname known to the New York City

16   Police Department?

17              MR. HARVIS:  Objection.

18   A.    I don't know.

19   Q.    And --

20              MR. JOHNSON:  Exhibit A, it is a New York

21              City Police Department arrest report, Bates

22              number DEF 000001.

23              (Whereupon, the aforementioned document was

24              marked as Defendant's Exhibit A for

25              identification as of this date by the Reporter.)

J. HARRIS

1    A.    I don't know what PSA 7 stand for.  That's a
2  precinct though.

3    Q.    And what is the next arrest that you remember?

4    A.    That's it.

5    Q.    Do you recall if you were arrested on April 10th,
6  2015 in the vicinity of College Avenue and East 148 Street?

7    A.    No.

8          MR. JOHNSON:  This is Defendant's Exhibit C.

9          It is an arrest report for Jonathan Harris dated

10         April 10th, 2015 at 8:40 p.m.

11         (Whereupon, the aforementioned document was

12         marked as Defendant's Exhibit C for

13         identification as of this date by the Reporter.)

14   Q.    Is that your name and date of birth?

15   A.    Yes.

16   Q.    Does this refresh your memory about this

17 incident?

18   A.    Yes.

19   Q.    And why were you arrested on that date?

20         MR. HARVIS:  Objection.  You want to know

21         what the circumstances were?

22   Q.    Yes, where were you arrested?

23   A.    Where was I?

24   Q.    Yes.

25   A.    At the arrest location.

1    Q.    What did they charge you with?

2    A.    Looks like they charged me with possession of a

3    knife.

4    Q.    And if you go to the second page, do you remember

5    what you were wearing that day?

6    A.    No.

7    Q.    Do you know what jacket they were talking about

8    when they say you were wearing a jacket?

9    A.    No.

10   Q.    Do you own a black jacket?

11   A.    No.

12   Q.    Do you own sweat pants, blue sweat pants?

13   A.    No.

14   Q.    Do you own gray sneakers?

15   A.    No.

16   Q.    And do you know the officers who arrested you in

17   this?

18   A.    No, I do not.

19   Q.    Do you know the outcome of this criminal case?

20   A.    Had to pay a fine.

21   Q.    Did you plead guilty?

22   A.    Yes.

23   Q.    What did you plead guilty to?

24   A.    I don't remember what the charge was.

25   Q.    And why did you plead guilty?

J. HARRIS

| 1 | A. | Because I had the box cutter. |

2    Q.    Where did you acquire that?  Where did you get it

3    from?

4    A.    From the store.

5    Q.    What store?

6    A.    Like a hardware store.

7    Q.    Do you remember which hardware store?

8    A.    No.

9    Q.    Was it in the Bronx?

10   A.    Yes.

11   Q.    Was it near your apartment?

12   A.    Yes.

13   Q.    Why did you have that?

14   A.    I was helping my aunt with the boxes.  To cut

15   boxes.

16   Q.    And why did you plead guilty then?

17   A.    Because I had it.

18   Q.    I will say, the arrest report said something

19   about a gravity knife, do you know what that means?

20   A.    I don't know what that means.

21   Q.    Do you remember when you were arrested on April

22   4th, 2015?  Did you have to post bail?

23              MR. HARVIS:  What's April 4?

24   Q.    April 10th, 2015, did you have to pay bail?

25   A.    The same picture you showed me?

1    Q.    Why did you think that you had to turn yourself

2    in?

3    A.    Because I felt I didn't do nothing.  What's the

4    point of me --

5              MR. HARVIS:  When did you learn that there

6              was an indictment that you were facing?

7    A.    The indictment happened December 9th.  I found

8    out later that day the 10th she called for the meeting and

9    the 11th came in.

10   Q.    The 10th your attorney called for a meeting?

11   A.    Yes, set it up for the next day for Friday the

12   11th.

13   Q.    Were you the only individual to turn yourself in

14   that day?

15   A.    No.

16   Q.    Who else turned themselves in?

17   A.    Corey Cooks.

18   Q.    Who else?

19   A.    That's it.

20   Q.    Is Corey Cooks a friend of yours?

21             MR. HARVIS:  Objection.  He will not answer

22             any questions that pertain to the charges he is

23             under indictment for.  I think, unless there are

24             questions that don't involve the actual case, I

25             am happy to have him answer.  In terms of his

1     Q.     Are you a member of the 18 Park Gang?

2             MR. HARVIS:  Objection.  That's Fifth

3             Amendment.  We are not answering that.

4     Q.     Did the New York City Police Department ever

5  believe you were part of a gang?

6             MR. HARVIS:  Objection.  Don't answer.

7             MR. JOHNSON:  I go back to Exhibit A.  Under

8             here, it says gang affiliation, yes, 18 Park

9             Gang.  Do you deny being a member of that gang?

10           MR. HARVIS:  Objection.  Don't answer that.

11           He didn't prepare that document.  He has no

12           involvement in the preparation of that document.

13           We are not answering any questions about the 18

14           Park Gang.  It has nothing to do with our case.

15           MR. JOHNSON:  Are you asserting your Fifth

16           Amendment right?

17           MR. HARVIS:  What's the question?

18     Q.     Are you a member of the 18 Park Gang?

19           MR. HARVIS:  He answered that.  He said he

20           is not a member of any gang.

21     Q.     Are you a member of the 18 Park Gang?  Why did

22  the NYPD think you were a member of 18 Park Gang?

23           MR. HARVIS:  Objection.  He is not answering

24           that.

25     Q.     So it is your assertion you don't belong to the

J. HARRIS

| 1 | Q. | How did you meet your girlfriend? |
|---|----|-----------------------------------|

1    Q.    How did you meet your girlfriend?

2    A.    I know her since I was a little younger.

3    Q.    And so were you at her place that night?

4    A.    I could have been.  I don't know.

5    Q.    Do you know the first place you went on May 7th,

6    2015?

7    A.    No, I don't.

8    Q.    Do you remember any place you went to on May 7th,

9    2015?

10    A.    Yes.

11    Q.    Where was that?

12    A.    Downtown.

13    Q.    Where was that?  Do you remember that location?

14    A.    63, Amsterdam, where the incident took place.

15    Q.    Why did you go to 63, Amsterdam?

16    A.    Because a friend of mine is down there.

17    Q.    What friend is that?

18    A.    Nate.

19    Q.    What's his last name?

20    A.    I don't know.

21    Q.    How do you know Nate?

22    A.    Because family relative, things.

23    Q.    How often did you visit Nate?

24            MR. HARVIS:  What period of time?

25            MR. JOHNSON:  During this period of time

```
 1            Fifth Amendment.  I will not allow him to answer.

 2    Q.      Were they with you?

 3    A.      Not with me.

 4            MR. HARVIS:  You can ask him, but same

 5            objection.

 6            MR. JOHNSON:  He answered.  That's fine.

 7    Q.      So the people you were indicted with, one of them

 8    was at the location?

 9            MR. HARVIS:  He is not answering that on

10            Fifth Amendment grounds.

11    Q.      Did you possess any illegal drugs on May 7th,

12    2015 in the vicinity of 217 West 63rd Street?

13    A.      No.

14    Q.      Did you possess marijuana on May 7th, 2015?

15            MR. HARVIS:  Objection.  He answered that

16            question.

17    A.      No.

18    Q.      Did anyone in the vicinity of that area have

19    marijuana?

20            MR. HARVIS:  Objection.  You can answer.

21    A.      No.

22    Q.      Do you know of anyone who possessed illegal drugs

23    on May 7th, 2015?

24            MR. HARVIS:  Objection.  In the world?

25            MR. JOHNSON:  In the vicinity of 217 West
```

J. HARRIS

1    Street?

2        A.    I don't really remember.  I don't know if it was

3    a train or cab.

4        Q.    And what time did you arrive at that location?

5        A.    I don't really remember.

6        Q.    And how long were you at that location?

7        A.    To my recollection, I would say maybe an hour or

8    two.

9        Q.    And did there come a time when you saw police

10   officers in the vicinity of 217 West 63rd Street?

11       A.    Yes.

12       Q.    When did you first see them?  Where did you first

13   see them?

14       A.    When they stopped me.

15       Q.    And do you remember who stopped you?

16       A.    No.  I don't remember his name.  I know how he

17   looked.  I don't remember his name.

18       Q.    What did he look like?

19       A.    Tall Caucasian guy.

20       Q.    Could you tell how old he was?

21       A.    Maybe late thirties, early forties.

22       Q.    Had you ever seen him before?

23       A.    Yes.

24       Q.    Where did you see him before?

25       A.    146, Third and College.

J. HARRIS

1          you.

2     A.    They stopped me.  Asked me what's my name.  I

3     told them my name.

4     Q.    What did they do after that?

5     A.    He turned, walked back.  And then he asked me do

6     I have ID.  I told him yes.  Grabbed the ID.  Then he

7     called to his partner and that's when he came back and then

8     was like, you don't remember me, mama boy?  That's it.

9     Q.    What did you say?

10    A.    No.

11    Q.    Then what did he say after that?

12    A.    I don't remember what he said after that.

13    Q.    What happened after that?

14    A.    He searched me.

15    Q.    How did he search you?

16    A.    He pat me down.

17    Q.    Why did he search you?

18          MR. HARVIS:  Objection.

19    A.    I don't know why.

20    Q.    Then what did he do?

21    A.    He walked away.  Then another officer searched

22    me.

23    Q.    Then did they find anything?

24    A.    No.

25    Q.    Then what happened next?

J. HARRIS

1    A.    They went towards like the right, towards back to

2  their car.

3    Q.    Then what?

4    A.    Then when I was getting ready to go into the

5  building, told me hold on.

6    Q.    What building was that?

7    A.    I don't know, I don't know the number of the

8  building.

9    Q.    Then what happened next?

10    A.    That's when I seen him go next to a coat, jacket,

11  coat.

12    Q.    This jacket was?

13    A.    Was on a gate fence.

14    Q.    Where was this fence?

15    A.    Fifteen to -- twelve to fifteen feet away from

16  me.

17    Q.    Had you seen that jacket before?

18    A.    No.

19    Q.    Then what happened next?

20    A.    One officer searched the coat.  Dropped it on the

21  floor.  Then the next officer picked up the coat.  Searched

22  it as well.  And that's when he pulled out something from

23  the coat and he was like it is yours.

24    Q.    What did you say?

25    A.    I said it is not mine.

J. HARRIS

1    Q.    That wasn't yours?

2    A.    It wasn't mine.

3    Q.    And why did the police officers think it was

4  yours?

5             MR. HARVIS:  Objection.

6             Do you know why the police officers thought

7        that?

8    A.    I don't know what's in the next person's mind.

9    Q.    Had you been standing by that gate before when

10  the police arrived?

11    A.    No.

12    Q.    Had you stood by that gate before?

13    A.    No.

14    Q.    You are sure of that?

15    A.    Positive.

16    Q.    And the gate was in full view of everybody with

17  many people standing by that gate?

18    A.    No.

19    Q.    Was there anyone standing by the gate?

20    A.    Nobody was standing by the gate.  People were

21  still walking by.

22    Q.    And the gate, could you see it looking straight

23  on where the jacket was or was it to the left or to the

24  right of you?

25    A.    To your right side.

1      Q.      How far from the entrance of the, how far from

2   where you were first stopped by the cop was that jacket?

3      A.      Ten, fifteen feet.

4      Q.      Then when you were walking to the building, how

5   far was the jacket from you?

6      A.      That's when I got stopped at when I was in front

7   of the building.

8      Q.      And what happened next?

9      A.      Put me in handcuffs. Put me in the back of the

10   car. Took out his iPhone. Started taking pictures. And

11   that's when I believe he contacted 40 Precinct and told

12   them that he got mama's boy.

13      Q.      Why did he call you mama's boy?

14              MR. HARVIS: Objection.

15      Q.      Had anyone ever called you that before?

16      A.      No.

17      Q.      So he took a picture of you.

18              What kind of picture did he take?

19              MR. HARVIS: Objection.

20      A.      What you mean what type of picture.

21      Q.      Were you fully dressed?

22      A.      No, I was in the back of the cop car, handcuffed.

23      Q.      Did he make you take any of your clothes off?

24      A.      I was in the back of the van in the cop car.

25      Q.      How long was that telephone conversation? Do you

J. HARRIS

1    remember?

2             MR. HARVIS:  When he called the 40 Precinct?

3             MR. JOHNSON:  Yes.

4    A.    Not long.

5    Q.    Minute?

6    A.    Not long.

7    Q.    How many pictures did he take of you?

8    A.    A few.

9    Q.    And did he tell you why he was taking your

10   picture?

11   A.    No.

12   Q.    So to be clear, he called somebody in the 40

13   Precinct?

14   A.    Yes.

15   Q.    And what did he say again?

16   A.    He had mama's boy.

17   Q.    Did you believe he was talking about you?

18   A.    He just called me that I believe I am the only

19   one in the car he is talking about me.

20   Q.    Prior to the police arriving there, who were you

21   standing next to?

22   A.    What you mean?

23   Q.    Who else were you with when the cops stopped you?

24   Was there anyone else next to you?

25   A.    Two females.

J. HARRIS

1    that park?

2       A.     No.

3       Q.     How often would you encounter police officers in

4    that park?

5                    MR. HARVIS:  Objection.

6       A.     What do you mean?

7       Q.     You said in your earlier lawsuit you were

8    assaulted by police officers outside that park.  Is that

9    the only time the police officers had spoken to you at that

10   park, any police officers?

11      A.     There is police officers there.

12      Q.     Have you spoken to them before?

13      A.     No.

14      Q.     Do you know any of those police officers?

15      A.     No.

16      Q.     Do you have any tattoos?

17      A.     Yes.

18      Q.     What are your tattoos?

19      A.     My mother name.  A rose.  Money rose.  Dollar

20   bill, one hundred dollar bill.  Bags of money.  Two faces.

21   And M.O.B.

22      Q.     And who does M.O.B. stand for?

23      A.     Money over, you say, money over bitches.

24      Q.     Do you have a tattoo that says the number 18 on

25   it?

J. HARRIS

1    member of a gang?

2        A.    No.

3        Q.    Do you know if anyone in that crowd was a member

4    of the 18 Park Gang?

5        A.    No.  There is no 18 Park Gang.  You can stop

6    asking me that.

7                MR. HARVIS:  We will assert the Fifth

8                Amendment right with respect to any questions

9                regarding the 18 Park Gang.  Beyond that --

10                MR. JOHNSON:  You should be consistent about

11                the Fifth Amendment.

12                MR. HARVIS:  Fair enough.  We are here.

13                MR. JOHNSON:  I will mark it for ruling.  He

14                already opened the door when he answered it.

15                MR. HARVIS:  You cannot waive them.  You

16                cannot open the door to them.  As to any future

17                questions, he reserves them.  That's what we will

18                do.

19        Q.    18 Park Gang, when I asked if the 18 Park Gang

20    was there on that location on May 7th, 2015, you are

21    asserting your Fifth Amendment?

22                MR. HARVIS:  That wasn't the question, but I

23                will assert my right with respect to that.

24        Q.    Was 18 Park Gang at that location on May 7th,

25    2015?

1          MR. HARVIS:  We are not answering that on

2          Fifth Amendment grounds.

3     Q.    So you got into the police vehicle and where did

4     they take you?

5     A.    To the precinct.

6     Q.    Do you know which precinct that was?

7     A.    No.

8          MR. HARVIS:  It was the 20 Precinct.

9     Q.    Do you know if it was the 20 Precinct?

10    A.    I don't know what precinct it was.

11    Q.    For the record, I will state Exhibit A the arrest

12    report for Jonathan Harris dated May 7th, 2015 states he

13    was transported to the 20 Precinct.

14          MR. HARVIS:  I will object to say that it

15          doesn't say he was taken there.  It does indicate

16          that was the precinct of the arrest.

17    Q.    What happened when you got to the precinct?

18    A.    I believe they took my fingerprints.  Left me in

19    the cell after that.

20    Q.    Did anyone come by to examine your status at that

21    time?

22    A.    Not that I remember, no.

23    Q.    And did the police officers ask you any questions

24    while you were in the cell?

25    A.    No.

J. HARRIS

1    A.    Because I was falsely arrested.  Taken to the

2    precinct and spent several hours in there for no reason not

3    knowing what was going to be the outcome.

4    Q.    Was that the first time you had been taken to the

5    precinct for that lifetime?  Had you ever been sent to

6    central booking?

7    A.    Yes.

8    Q.    Have you ever been at Rikers Island?

9    A.    Yes.

10   Q.    How long were you at Rikers Island?

11   A.    I believe two days.

12   Q.    And how long had you been inside the Metropolitan

13   Correctional Center?

14   A.    Maybe five months.

15   Q.    Other than yourself, does anyone else have -- do

16   you know of anyone else who supports your version of

17   events, any witnesses that can testify on your behalf in

18   this case?

19   A.    What you mean?

20   Q.    Is there anyone that you know that can back up

21   your story?

22   A.    Yes.

23   Q.    What are their names?

24   A.    I don't know the name.

25   Q.    Do you know what they look like?