UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  12 15 17
```

JONATHAN HARRIS,

      Plaintiff,

-against-

CITY OF NEW YORK, *et al.*,

      Defendants.

No. 15-cv-8456 (CM)

## DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

McMahon, C.J.:

      Plaintiff Jonathan Harris brings this action pursuant to 42 U.S.C. § 1983 against Defendants Detective Neil Magliano, Detective Brian Taylor, Detective Justin Parris, Sergeant Wesley Fradera, and Sergeant Sean Noce of the New York City Police Department ("NYPD") and the City of New York. Plaintiff asserts claims for false arrest, failure to intervene, denial of the right to a fair trial based on the fabrication of evidence, and failure to train and supervise. He has withdrawn his unlawful stop and search claim.

      The parties now make cross-motions for summary judgment. Defendants move for summary judgment on all claims; Plaintiff moves for partial summary judgment on his false arrest claim only.

      For the reasons stated below, Defendants' motion for summary judgment is granted in part and denied in part and Plaintiff's motion for partial summary judgment is denied.

1

## FACTS

Unless otherwise noted, the following facts are undisputed.

At about 11:36 p.m. on May 7, 2015, police were called to the area of West 64th Street and West End Avenue to investigate a 911 call reporting that a black male suspect, approximately five feet eight inches tall and wearing a black hooded sweatshirt and black pants, had a gun in his waistband. (Decl. of Paul H. Johnson in Defs.' Mem. L. in Supp. of Mot. Summ, J. ("Johnson Decl."), Ex. C ("Sprint Report"), ECF No. 80.)

Detectives Taylor and Magliano and Sergeant Noce responded to the 911 call. (Defs.' Statement of Undisputed Facts ("Defs.' 56.1") ¶ 1, ECF No. 81; Pl.'s Resp. to Defs.' 56.1 ("Pl.'s Resp. 56.1") ¶ 1, ECF No. 90.) The officer saw Plaintiff standing in the area of West 64th Street and West End Avenue and stopped him, because, according to Defendants, Plaintiff matched the description given by the 911 caller. (Defs.' 56.1 ¶ 3–5.) According to Detective Taylor's arrest report, Plaintiff is a black male, standing at five feet, nine inches and he was wearing a black "sweat shirt or jogging jacket" and other black "sweat/jogging clothes." (Johnson Decl., Ex. D, at 1–2 ("Arrest Report").)

The parties disagree on what transpired next.

According to Defendants, Detective Magliano observed Plaintiff throw a jacket along a nearby fence when he saw the officers arrive. (Johnson Decl., Ex. E ("Magliano Dep.") 40:19–21; Defs.' 56.1 ¶ 6.) The officers, then, stopped Plaintiff, and Sergeant Noce picked up the jacket and retrieved a scalpel from inside it. (Magliano Dep. 40:5–6, 61:3–7; Johnson Decl., Ex. K ("Declination of Prosecution").)

Plaintiff testified that he had never held the jacket and that it had been hanging on the fence when he arrived there. (*Id.* 49:9–18, 49:24–50:2; Pl.'s Resp. 56.1 ¶ 6.) According to Plaintiff, after he was stopped, one of the officers, whom Plaintiff recognized, asked him for his name and

2

identification. (Decl. of Gabriel P. Harvis in Pl.'s Opp'n to Mot. Summ, J. on Qualified Immunity, Ex. 1, 46:22–23, 48:2–6, ECF No. 31.) The officer told Plaintiff that he recognized him and asked, "[Y]ou don't remember me, mama boy?" (*Id.* 48:6–8.) After Plaintiff provided his identification, the officers searched him, but did not find anything. (*Id.* 48:13–24.) The officers let Plaintiff go and began walking toward their vehicle. (*Id.* 49:1–5.)

As Plaintiff started leaving, he was ordered to stop. (*Id.* 49:1–5.) One of the officers picked up a jacket – which had been hanging on a fence about twelve to fifteen feet away from Plaintiff – recovered a scalpel, and asked Plaintiff if it belonged to him. (*Id.* 49:1–16, 19–23.)

The parties agree on what happened next.

Plaintiff denied that the scalpel and jacket were his. (*Id.* 49:24–50:2; Defs.' 56.1 ¶ 9; Pl.'s Resp. 56.1 ¶ 9.) Detectives Magliano and Taylor arrested Plaintiff for possession of a "cutting instrument," purportedly in violation of New York Penal Law § 265.01(1). (Arrest Report; Johnson Decl., Ex. G ("Taylor Dep.") 17:2–8; Declination of Prosecution.). Detective Taylor assisted in arresting Plaintiff and was listed as the arresting officer. (Arrest Report, at 3.) Detective Magliano placed Plaintiff in handcuffs. (Defs.' 56.1 ¶ 10.)

Sergeant Fradera, who was assigned to supervise the two detectives that day, verified Plaintiff's arrest based on information the officers communicated to him. (Arrest Report, at 3; Johnson Decl., Ex. J ("Fradera Decl."), ¶¶ 4, 9.)

A fourth officer, Detective Parris, noted in his memo book that he was riding in the same police car with Detective Taylor on the evening in question, beginning at 7:30 p.m. (Decl. of Gabriel P. Harvis to Pl.'s Mem. L. in Opp'n to Mot. Summ, J. ("Harvis Decl."), Ex. 1 ("Parris Memo Book"), ECF No. 89.) His next memo book notation, which reads "RTC," was entered at 2:45 a.m. (*Id.*) In his declaration, Detective Parris states that he did not interact with Plaintiff and

3

had no involvement in Plaintiff's arrest. (Johnson Decl., Ex. I ("Parris Decl."), ¶¶ 3–8.) There is no other information in the record about Detective Parris's whereabouts during Plaintiff's arrest.

After being arrested, Plaintiff was brought to the 20th Precinct. (Taylor Dep. 17:7–9.) He was eventually issued a desk appearance ticket charging him with Criminal Possession of a Weapon in the Fourth Degree, in violation of New York Penal Law § 265.01(1) and released. (Johnson Decl., Ex. H ("DAT").) That section provides

> A person is guilty of criminal possession of a weapon in the fourth degree when… He or she possesses any firearm, electronic dart gun, electronic stun gun, gravity knife, switchblade knife, pilum ballistic knife, metal knuckle knife, cane sword, billy, blackjack, bludgeon, plastic knuckles, metal knuckles, chuka stick, sand bag, sandclub, wrist-brace type slingshot or slungshot, shirken or "Kung Fu star…."

The desk appearance ticket informed Plaintiff that he was required to appear in court on June 20, 2015. (DAT.)

The District Attorney for New York County declined to prosecute Plaintiff, because it is not unlawful simply to possess a scalpel under § 265.01(1), and Plaintiff did not display any intent to use the scalpel unlawfully. (Declination of Prosecution.) Because he had not been informed of the declination, Plaintiff complied with the DAT and went to the courthouse on June 20, 2015 as required by the desk appearance ticket. (Harvis Decl., Ex. 4, 59:6–12.) There, he was told that he was not being prosecuted and did not need to appear before a judge. (*Id.* 59:13–22.)

This lawsuit followed.

## DISCUSSION

### I.    Summary Judgment Standard

The parties have cross-moved for summary judgment. Plaintiff seeks summary judgment declaring that he was arrested without probable cause. Defendants seek summary judgment declaring that they had probable cause, or at least arguable probable cause, to arrest Plaintiff, or

4

that they are entitled to qualified immunity. Several Defendants also seek summary judgment on the ground of lack of personal involvement.

A party is entitled to summary judgment when there is no genuine issue as to any material fact and the undisputed facts warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Facts are material when they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once the moving party has made such a showing, the non-moving party must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Electric Ind. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (internal quotation marks omitted). The court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *Id.* at 600–01; *see also Cifra v. Gen. Elec. Co.,* 252 F.3d 205, 216 (2d Cir. 2001). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. Sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248.

## II.    The Complaint Is Dismissed as Against Detective Parris for Lack of Evidence of Personal Involvement.

In his complaint, Plaintiff asserts false arrest claims against both officers who actively participated in his arrest and against others who were allegedly present but failed to intervene in what they allegedly should have known was an unlawful arrest. Unfortunately, he fails to identify

5

in his complaint which officers fall into which camp. Defendants appear to argue that summary judgment dismissing the complaint as against all officers except Detective Magliano would be appropriate, because no other officer was personally involved in the unlawful arrest.

To be held liable under § 1983 for false arrest or failure to intervene, an officer must be "personally involved" in an unlawful arrest. *Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir. 2001). An officer can be personally involved in one of two ways: He can directly participate in the arrest, or he can fail to intervene to stop an unlawful arrest when the evidence establishes that he would have been able to do so. *See Wong v. Yoo*, 649 F. Supp. 2d 34, 61 (E.D.N.Y. 2009); *Mack v. Town of Wallkill*, 253 F. Supp. 2d 552, 558–59 (S.D.N.Y. 2003).

An officer can become a direct participant in an arrest in a number of ways. Obviously, he can place handcuffs on a suspect and detain him physically, as Detective Magliano did in this case. However, there are other ways in which an officer can "directly participate" in an arrest. He can serve as the "arresting officer" on the paperwork; he can advise or confer with an arresting officer about an arrest; he can order that another officer arrest a suspect; *See Mack*, 253 F. Supp. 2d at 558–59; *Wong*, 649 F. Supp. 2d at 61.

Detective Taylor, as the official "arresting officer," was a direct participant in Plaintiff's arrest, so the complaint cannot be dismissed as against him for lack of personal involvement.

Similarly, the complaint cannot be dismissed for lack of personal involvement as to Sergeant Noce. According to the evidence – which consists of the property voucher for the scalpel and the Declaration of Prosecution – Sergeant Noce is the person who found the scalpel, the item Plaintiff was arrested for possessing. He was the person provided the information used by Detective Maglaino as justification for restraining Plaintiff and by Detective Taylor for booking Plaintiff. Therefore, he, too, is a direct participant.

6

The fact that Sergeant Noce does not remember Plaintiff's arrest is no basis for dismissing the complaint as against him for lack of personal involvement, because lack of recollection does not raise a genuine issue of fact. *See Hinz v. Village of Perry*, 2015 WL 3849558, at \*7 (W.D.N.Y. June 22, 2015); *Carter v. Newsday, Inc.*, 528 F. Supp. 1187, 1191 (E.D.N.Y. 1981). Both the declination of prosecution and the property voucher identify Seargeant Noce as the person who found the purported contraband that occasioned the arrest; and the Defendants' Rule 56.1 Statement states that Sergeant Noce found the scalpel. Defs.' 56.1 ¶ 7. Since the arrest could not have been made unless Sergeant Noce told Detective Magliano what he found, Sergeant Noce necessarily participated in the arrest.

Finally, Sergeant Fradera participated in the arrest by "verifying" it. As best as the court can conclude (the evidence about arrest verification – a term this court has never encountered in nineteen years of handling false arrest cases – is essentially non-existent), a supervising officer "verifies" an arrest by concluding that the officers had probable cause to make the arrest. In effect, he signs off on the arrest; otherwise, it would have been "voided." NYPD Patrol Guide, Procedure No. 210-13, at 1. Verification is thus part of the arrest process and can be analogized to a fellow officer's advising an arresting officer in connection with an arrest (as Sergeant Noce did here) or with a supervisor's ordering a subordinate to arrest a suspect. On that reasoning, Sergeant Fradera was a direct participant in the arrest and can be held liable for false arrest. Indeed, in *Alicea v. City of New York*, 2016 WL 2343862, at \*4, 6 (S.D.N.Y. May 3, 2016), the court assumed that a supervisor who verified an unlawful arrest could be held liable for false arrest.

However, Detective Parris is entitled to summary judgment because there is insufficient evidence from which a trier of fact could conclude that Detective played any role, direct or indirect, in Plaintiff's allegedly unlawful confinement.

7

Detective Parris was riding with Detective Taylor that evening, so a reasonable trier of fact could infer that he arrived at the scene with Taylor. But there is no evidence that Detective Parris played any direct role in the arrest – no indication that he touched Plaintiff or confined him, or that he saw anything that he communicated to the actual arresting officers, as Sergeant Noce allegedly did. Detective Parris testified under oath that he was not involved with the arrest and Plaintiff offers no evidence to the contrary. Indeed, Plaintiff did not even bother to depose Detective Parris, to try to obtain information from him or to undermine his denial of involvement by cross examination.

There is also no evidence that would support a failure to intervene claim against Detective Parris, because there is no evidence, from anyone (including Plaintiff) that Detective Parris was close enough to the arrest to have been able to intervene and stop it. For all we know, Detectives Parris and Taylor split up when they came on scene and went in opposite directions looking for their suspect. There is no evidence one way or another.

Plaintiff argues that the fact that Defendants identified Detective Parris in response to Plaintiff's request pursuant to *Valentin v. Dinkins*, 121 F.3d 72 (2d Cir. 1997), indicates that Detective Parris was personally involved. Put otherwise, Plaintiff would have the court treat the *Valentin* response as an admission by the City that Detective Parris was involved in the arrest.

However, a response to a *Valentin* request has never, as far as this court is aware, been treated as an admission of actual involvement, as opposed to a suggestion of who might have been involved that is offered to the plaintiff as a means of facilitating the commencement of the lawsuit. Indeed, the City's initial *Valentin* response identified another officer in addition to Detective Parris, Detective Domingo Ayala, as having been involved in the arrest; but Det. Ayala actually went off duty some hours before the arrest occurred, so he clearly had no involvement in the arrest.

8

Detective Ayala was identified simply because he had been riding with Detective Taylor (who was in fact involved) earlier in the shift.

All that one can discern from a *Valentin* response is that the City, trying to ascertain who might have been present at or involved in a particular incident, concluded that Detective Parris was a candidate for involvement. The City's response says nothing at all about what Detective Parris did or did not do, whether he was actually present or was just somewhere in the vicinity. There is no warrant for treating the City's effort to identify which police officers might be the "John Does" named in the complaint as an admission that those officers were, as a matter of law or fact, "involved" in the arrest.

Thus, the City's motion for summary judgment dismissing the complaint against all officer defendants other than Detective Magliano for lack of personal involvement is granted as to Detective Parris and denied as to all the other officers.

Furthermore, since all of the remaining officers are alleged to have directly participated in the arrest – with the possible exception of Sergeant Fradera, who could not have intervened since there is no evidence that he was on the scene – there is no need to resort to a failure to intervene alternative claim. Therefore, that theory of liability is dismissed.

### III.   Plaintiff's Motion for Summary Judgment on the Issue of False Arrest Is Denied

To prevail on a false arrest claim, a plaintiff must prove that "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Bernshtein v. City of New York*, 496 F. App'x 140, 141 (2d Cir. 2012) (internal alterations and quotation marks omitted) (quoting *Weyant v. Okst,* 101 F.3d 845, 853 (2d Cir. 1996)). An arrest is privileged where an officer has probable cause. *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007). Probable

9

cause exists when "officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Id.* (internal quotation marks omitted). Officers need not have probable cause for the specific offense with which a plaintiff was charged; a false arrest claim fails if there was probable cause to arrest the plaintiff for any offense. *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004); *Jaegly v. Couch*, 439 F.3d 149, 153–54 (2d Cir. 2006).

On his motion for summary judgment, Plaintiff argues that, even viewing the evidence in Defendants' favor, the officers lacked probable cause to arrest him for criminal possession of a weapon. I agree.

Whether Defendants had probable cause to arrest Plaintiff because they believed that he possessed a scalpel was discussed extensively in the Court's opinion denying their motion to dismiss. They did not have probable cause to arrest him on that basis.

Section 265.01(1) provides:

> A person is guilty of criminal possession of a weapon in the fourth degree when... He or she possesses any firearm, electronic dart gun, electronic stun gun, gravity knife, switchblade knife, pilum ballistic knife, metal knuckle knife, cane sword, billy, blackjack, bludgeon, plastic knuckles, metal knuckles, chuka stick, sand bag, sandclub, wrist-brace type slingshot or slungshot, shirken or "Kung Fu star...."

It should be obvious to anyone reading the statute that it does not leave police officers in the dark about what types of instruments are forbidden, and equally obviously that, "Not every knife is a weapon for purposes of Penal Law § 265.01(1)." *People v. Dreyden*, 15 N.Y.3d 100, 103 (2010). Section 265.01(1) only prohibits possession of specific types of knives: gravity knives, switchblade knives, pilum ballistic knives, and metal knuckle knives. A scalpel is not on that list,

10

so mere possession of a scalpel does not violate § 265.01(1). No reasonable officer could believe that it is. *See Harris v. City of New York*, 222 F. Supp. 3d 341, 350 (S.D.N.Y. 2016).

So, in the alternative, Defendants argue that they had probable cause to arrest him for another offense: for a violation under New York City Administrative Code § 16-118(1)(a).

Section 16-118(1)(a) is the City's anti-littering ordinance. It provides, in relevant part, that "No person shall litter, sweep, throw or cast... any ashes, garbage, paper, dust or other rubbish and refuse of any kind whatsoever, in or upon any street or public place." Defendants argue that Plaintiff violated the anti-littering ordinance by throwing his jacket on the ground.

There is absolutely no question that the officers did not actually arrest Plaintiff for littering; indeed, I rather imagine that the Corporation Counsel came up with this argument, and relatively recently.

But it matters not that the officers DID not arrest Plaintiff for littering; the relevant question is whether they COULD HAVE arrested Plaintiff for littering. If they could have (had it occurred to them at the time), then the arrest is privileged. *See Devenpeck*, 543 U.S. at 153.

So could Defendants have arrested Plaintiff for littering?

That cannot be answered on a motion for summary judgment, because it depends on the resolution of disputed issues of fact.

The first such issue is the same issue raised earlier: whether plaintiff threw the jacket down, as Detective Magliano testified, or whether the jacket was hanging on a fence nowhere near Plaintiff when the police grabbed it, as plaintiff testified. If Plaintiff did not have the jacket on his person, he could not have been arrested for "littering" by dropping it on the ground. That genuine issue of fact bars summary judgment.

11

The second question raised by the officers' argument is whether a reasonable trier of fact could conclude that a jacket falls within the ordinance's definition of "litter:" It might. Clearly, a jacket is not ashes, paper, or dust. It could, however, be "garbage," "rubbish," or "refuse." Merriam-Webster defines these three words similarly, to mean "food waste" (which the jacket is not) or "discarded or useless material." *Garbage*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003). To "discard" something means "to get rid of especially as useless or unwanted." *Discard*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003). If Plaintiff "discarded" the jacket because it was "unwanted," then throwing it on the ground might in fact be described as littering within the meaning of § 16-118(1)(a). The arrest cannot be thrown out as a pure matter of law on Plaintiff's motion.

I recognize that, in all the cases this Court has found addressing the issue of probable cause under the anti-littering ordinance, the discarded items were the kind of thing one ordinarily throws into a trash container: a food wrapper, *United States v. Herron*, 18 F. Supp. 3d 214, 222 (E.D.N.Y. 2014), an open beer bottle, *United States v. Davis*, 111 F. Supp. 3d 323, 329, 333 (E.D.N.Y. 2015), a styrofoam cup, *People v. Mangum*, 125 A.D.3d 401, 401 (1st Dep't 2015), water balloons that had burst, *People v. Ormsby*, 30 A.D.3d 757, 757 (3d Dep't 2006), and "garbage from a bag," *Peterec v. City of New York*, 2015 WL 1027367, at *4 (S.D.N.Y. Mar. 6, 2015). Similarly, in cases arising under analogous anti-littering statutes, the items discarded are inarguably trash. Applying Vehicle and Traffic Law § 1220(a), which prohibits littering on or near highways, one court found that throwing a beer can out of the window of a parked car constituted littering. *People v. Sanchez*, 192 A.D.2d 562, 563 (2d Dep't 1993). And, under the New York City Health Code § 153.01, a now-repealed section that also prohibited littering in public, a court found that officers had probable cause to arrest because the Plaintiff tore up a traffic ticket she received and threw the

12

pieces on the ground. *Sands v. City of New York*, 2006 WL 2850613, at \*1, 3 (E.D.N.Y. Oct. 3,

2006). None of these cases involved dropping a useful article that someone would ordinarily have

been unlikely to throw away -- such as a perfectly wearable jacket with a perfectly legal-to-possess

scalpel in the pocket.

But all that means is that there is a very real question about whether such an item can be

considered "litter." That question, too, is for the jury – if it first concludes that Plaintiff actually

threw down the jacket.

## IV.    Defendants' Motion for Summary Judgment on the issue of Qualified Immunity Is Denied

Even where they lack probable cause, officers are entitled to qualified immunity when

"their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." *Lore v. City of Syracuse*, 670 F.3d 127, 162 (2d Cir. 2012)

(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A right is clearly established if "it would

be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.*

(emphasis omitted). Qualified immunity does not protect an officer merely because "the very

action in question has [not] previously been held unlawful." *Anderson v. Creighton*, 483 U.S. 635,

640 (1987). However, "The contours of the right must be sufficiently clear that a reasonable

official would understand that what he is doing violates that right." *Id.*

Qualified immunity protects officers regardless of whether their error was a mistake of law,

fact, or both. *Sudler v. City of New York*, 689 F.3d 159, 174 (2d Cir. 2012). Defendants bear the

burden of proving that their actions were objectively reasonable in light of the law existing at the

time. *See Lore*, 670 F.3d at 149; *Tellier v. Fields*, 280 F.3d 69, 84 (2d Cir. 2000).

On their motion for summary judgment, Defendants argue that the officer defendants are

entitled to qualified immunity because a reasonable officer could have believed that possession of

13

a scalpel under the circumstances was unlawful. But Defendants are charged with knowledge of the law. The text of the statute under which they charged Plaintiff makes it perfectly clear that a scalpel is not among the forbidden objects.

Defendants argue that they could have been unsure about the scope of the law because no case has specifically held that possession of a scalpel does not fall within § 265.01(1). However, the law on which Defendants relied contains an exhaustive list of what items an individual may not possess. By including a comprehensive list of forbidden items, § 265.01(1) necessarily permits possession of other types of sharp objects (like a scalpel). New York's courts have so held repeatedly and clearly. *See, e.g.*, *Dreyden*, 15 N.Y.3d at 103; *People v. Campos*, 93 A.D.3d 581, 581 (1st Dep't 2012). The defendant officers are charged with knowledge of those holdings.

Of course, had Plaintiff been menacing someone while holding a scalpel in his hand, he could have been arrested for assault, or for menacing, and the sharp pointed objected could have been considered an enhancing "weapon." But there is no evidence of anything like that in this case. On the contrary, even on the view of the facts most favorable to the police, Plaintiff was nowhere near the scalpel when it was found in the pocket of the (allegedly) discarded jacket.

Were there any doubt about the scope of the relevant law (which there is not), there is a second reason why Defendants' would not be entitled to summary judgment on the question of qualified immunity: There are disputed issues of fact concerning whether Plaintiff possessed the scalpel at all. Plaintiff testified at his deposition that he was never in possession of the jacket and that, when the officers approached him, the jacket, "was hanging at a considerable distance from [him]." *Harris*, 222 F. Supp. 3d at 350. Since that earlier decision, Defendants have produced testimony from Detective Magliano that he witnessed Plaintiff drop the jacket when he saw the

14

officers approaching. However, if the trier of fact believes Plaintiff and not the officers, then Plaintiff could not possibly have possessed the scalpel, because he never possessed the jacket.

The same genuine issue of material fact bars Defendants from qualified immunity on the "littering" issue. If Plaintiff never had the jacket – if Detective Magliano is making up the story about Plaintiff's dropping the jacket – then he could not possibly have violated § 265.01(1).

Whether Sergeant Fradera is or is not entitled to qualified immunity presents a closer question, since ordinarily an officer is entitled to rely on what he is told by a fellow officer in making a decision about an arrest. However, on the record before the court we have several problems that bar summary judgment.

Sergeant Fradera said he relied on Detective Magliano's observations in verifying the arrest for possession of a weapon (which is what the arrest was for – not for littering).

Detective Magliano testified that he observed the jacket being dropped and a scalpel being removed from the pocket by Sergeant Noce.

Sergeant Fradera, no less than the other officers, was charged with knowing that §265.01(1) did not bar possession of a scalpel.

Therefore, he is not entitled to qualified immunity, even though he relied on representations made by another officer.

## V.  Plaintiff's Claim for Denial of the Right to a Fair Trial Is Dismissed

Plaintiff claims the officers denied him the right to a fair trial by fabricating evidence against him, namely, by allegedly lying that Plaintiff had ever held the jacket or possessed the scalpel that the officers found.

To prevail on a denial of the right to a fair trial claim based on fabrication of evidence, a plaintiff must prove that "an (1) investigating official (2) fabricate[d] information (3) that is likely

15

to influence a jury's verdict, (4) forward[ed] that information to prosecutors, and (5) the plaintiff suffer[ed] a deprivation of life, liberty, or property as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016). To satisfy the final, causation element, a plaintiff must prove that the fabricated evidence forwarded to the prosecutor proximately caused his deprivation. *See Poventud v. City of New York*, 750 F.3d 121, 158–59 (2d Cir. 2014) ("In all § 1983 cases, the plaintiff must prove that the defendant's action was a proximate cause of the plaintiffs injury.") (quoting *Gierlinger v. Gleason*, 160 F.3d 858, 872 (2d Cir. 1998)). Therefore, the fabrication must have caused "some 'further deprivation'" beyond the deprivation wholly attributable to his unlawful arrest. *Ganek v. Leibowitz*, 874 F.3d 73, 91 (2d Cir. 2017); *see also Zahrey v. Coffey*, 221 F.3d 342, 350 (2d Cir. 2000). For example, fabricated evidence may cause a further deprivation if it adversely informs a prosecutor's charging and bail determinations. *Ganek*, 874 F.3d at 91.

Defendants are entitled to summary judgment dismissing this claim because, now that the facts have been fully developed, it is clear that Plaintiff suffered no injury by virtue of anything done by a prosecutor. The police issued the DAT and the prosecutor, when given the information by the police, declined to press charges. Plaintiff was not detained at the suggestion of any prosecutor; he did not have to post bail; the criminal case against him concluded even before he appeared in court. Indeed, once Plaintiff's prosecution was declined, there was no opportunity for the allegedly fabricated evidence to adversely influence any prosecutorial determinations and, thus, cause Plaintiff further injury.

Plaintiff argues that he suffered a deprivation that is functionally equivalent to being arraigned, satisfying the final element under *Garnett*. He points out that, because he was not informed of the declination, he appeared in court as he believed was still required of him. However, an arraignment is a "further deprivation" only because it stems from a prosecutor's decision to

16

proceed with a case against a defendant, based on information provided by law enforcement. Plaintiff was not deprived of his liberty by virtue of a prosecutorial decision; to the extent that his wasted morning in court constitutes a deprivation of liberty, it was because he was issued a DAT by the police, not the prosecutor. If Plaintiff lost wages, he can present evidence of that as damages attributable to his false arrest. But the prosecutor did him nothing but favors. He has no viable deprivation of fair trial claim. It is dismissed.

## VI.    The City's Motion for Summary Judgment on the Issue of Municipal Liability Is Granted

Finally, Defendants move for summary judgment on Plaintiff's claim for municipal liability under *Monell v. Department of Social Services.*, 436 U.S. 658 (1978), arguing that Plaintiff has failed to show that he suffered constitutional violations because of any municipal custom or policy.

A municipality is liable under § 1983 only for its "*own* illegal acts." *Connick v. Thompson*, 563 U.S. 51, 60 (2011). It cannot be held vicariously liable for the constitutional violations of its employees. *Id.* Therefore, to prevail on a *Monell* claim, a plaintiff must show "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). Municipal policy or custom includes the decisions of legislators, the acts of a municipality's policymaking officials, and "practices so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S. at 60. Thus, a plaintiff may satisfy the policy or custom requirement in one of four ways:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

17

*H.H. v. City of New York*, 2017 WL 3396434, at \*7 (E.D.N.Y. Aug. 7, 2017) (quoting *Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010)).

Plaintiff asserts *Monell* claims under the fourth approach – failure to train and supervise amounting to deliberate indifference. The facts required to prove failure to train and failure to supervise are different. I address each theory in turn.

### A.    Failure to Train

To prove a failure to train claim, a plaintiff must "identify a specific deficiency in the city's training program and establish that that deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 129 (2d Cir. 2004) (quoting *City of Canton*, 489 U.S. at 385); *accord Jenkins*, 478 F.3d at 95. A valid claim for failure to train must be "based on more than the mere fact that the misconduct occurred in the first place." *Amnesty Am.*, 361 F.3d at 130; *accord Jenkins*, 478 F.3d at 95 ("The mere fact that Jenkins was falsely arrested, without more, does not show that the City's training program is inadequate."). Rather, a plaintiff must produce evidence of "whether the [municipality] trained its officers…, how the training was conducted, how better or different training could have prevented the challenged conduct, or how a hypothetically well-trained officer would have acted under the circumstances." *Amnesty Am.*, 361 F.3d at 130 (internal quotation marks omitted). The evidence must allow a trier of fact to determine whether the officers were poorly trained – which could be attributable to the City – or whether they "deviate[d] from what they were taught." *Jenkins*, 478 F.3d 76, 95. This "ensure[s] that a failure to train theory does not collapse into *respondeat superior* liability." *Amnesty Am.*, 361 F.3d at 130.

Plaintiff had an opportunity to conduct discovery exploring the officers' training. Yet, he has not produced any evidence relating to the officers' training. His only evidence that the officers

18

were poorly trained is that they violated his constitutional rights. Plaintiff seems to argue that the officers' glaring misunderstanding of § 265.01(1) gives rise to the inference that they were improperly trained. But nothing in the record indicates that the officers' mistake was due to poor training. Accordingly, no reasonable juror could find on this record that the City failed to train the officers.

### B.   Failure to Supervise

To prove a failure to supervise claim, a plaintiff must show that "'the need for more or better supervision to protect against constitutional violations was obvious,' but that [policymaking officials] made 'no meaningful attempt' to forestall or prevent the unconstitutional conduct." *Amnesty Am.*, 361 F.3d at 129 (quoting *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995)). NYPD sergeants and detectives are not policymaking officials for purposes of *Monell* liability. *See Anthony v. City of New York*, 339 F.3d 129, 139 (2d Cir. 2003); *see also Vasquez v. City of New York*, 2013 WL 5519981, at *12 (E.D.N.Y. Sept. 30, 2013); *Cerbelli v. City of New York*, 2008 WL 4449634, at *12 n. 19 (E.D.N.Y. Oct. 1, 2008). Furthermore, the plaintiff must also show that the municipality's failure to supervise was a proximate cause of the deprivation of his rights. *See Cash v. County of Erie*, 654 F.3d 324, 342 (2d Cir. 2011); *Ortiz v. Goord,* 276 Fed. App'x 97, 98 (2d Cir. 2008).

Plaintiff has failed to produce any evidence that proves that a failure by the City to supervise the officers caused his constitutional deprivations. None of the officers involved in this case were policymaking officials – they were all either sergeants or detectives at the time of Plaintiff's arrest. Their actions and knowledge are not attributable to the City. Plaintiff has not offered any evidence at all relating to any policymaking officials or to the supervision of these or other officers. There is certainly nothing in the record that suggests that policymakers were on

notice of the need for better supervision. Nor is there anything in the record that shows that poor supervision actually caused Plaintiff's injury. As with his failure to train claim, Plaintiff solely relies on the fact of the constitutional violation to prove that the officers were improperly supervised. But there is nothing in the record that would allow a reasonable juror to attribute Plaintiff's injury to the City's lacking supervision of the officers.

In sum, Plaintiff has failed to produce any evidence of a municipal policy or custom that caused his injuries.

Accordingly, the City of New York is, hereby, dismissed from the case.

<h2 style="text-align:center">CONCLUSION</h2>

For the reasons stated above, Defendants' motion is GRANTED as to Detective Parris and the City of New York. They are dismissed as Defendants from this case. Defendants' motion is DENIED in all other respects.

Plaintiff's motion for partial summary judgment is DENIED.

The claims remaining for trial are Plaintiff's false arrest claims against Detectives Magliano and Taylor and Sergeants Noce and Fradera.

The Clerk of Court is respectfully directed to terminate the motions at Docket Numbers 79 and 84.

Dated: December 14, 2017

_____
Chief Judge

BY ECF TO ALL COUNSEL

20